**In re EAGLE–PICHER INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy No. 1–91–00100.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

June 6, 1996.

C. Marraro, C. Rieders, M. Zarin, S. Blesi, D. Neeb.

## DECISION ON MOTION TO APPROVE COMPROMISES AND TO DISALLOW CLAIMS

BURTON PERLMAN, Bankruptcy Judge.

262

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Introduction | 262 |
| II. | Government Claims | 263 |
| III. | The Settlement Agreement—Derivation of Provisions | 263 |
| IV. | The Motion of Debtors and the U.S. | 265 |
| | A. Debtors' Motion | 265 |
| | B. The Motion of the U.S. | 266 |
| | C. Response of Objecting PRPs | 268 |
| V. | Fairness | 269 |
| | A. Applicable Legal Standards | 269 |
| | B. Conclusions re Fairness | 269 |
| VI. | Other Grounds for Objection | 271 |
| VII. | Disallowance of PRP Claims | 273 |

## I. Introduction

In these consolidated Chapter 11 cases, debtors, which have long had operations dealing with natural resources, have become subject to certain claims against them involving environmental protection issues. While a claim or claims may be separately addressed to one or another of the consolidated debtors, we will for present purposes consider that all claims relevant herein are being asserted against debtors. These claims have been asserted by the United States of America on behalf of the U.S. Environmental Protection Agency (the "EPA") and the U.S. Department of the Interior (the "DOI"). Additionally, claims have been made against debtors of the same or a similar nature by the states of Arizona, Michigan and Oklahoma. Also, there are outstanding claims against debtors on account of alleged violations of environmental laws at debtors' Colorado Springs, Colorado, plant. Finally, certain parties co-liable with debtors, in the parlance of environmental litigation, potentially responsible parties ("PRPs"), have asserted claims against the consolidated debtors in the bankruptcy case.

Debtors have reached a settlement agreement (the "Settlement Agreement") with the United States of America ("U.S."), as well as with the states of Arizona, Michigan and Oklahoma. After debtors and the U.S. entered into the Settlement Agreement, the U.S. on March 27, 1995, served copies of Notice of Lodging of Proposed Settlement Agreement upon appropriate creditors, and filed the Notice with the court. The Notice stated that it was requested that the court not approve and enter the proposed Settlement Agreement at this time, but rather wait until the Settlement Agreement was published in the *Federal Register*, following which the U.S. would receive public comments for a 30–day period. The U.S. stated that it would file any comments received and then request that the court approve and enter the Settlement Agreement. Without waiting for this process to transpire, debtors on April 17, 1995 moved that the court approve the Settlement Agreement.

After publication in the *Federal Register* and the closure of the period for public comment, the U.S. filed its motion for approval of the Settlement Agreement. The motion of the U.S. was supported by a memorandum, by declarations of D. Mark Doolan and George Allen, and an affidavit of Paul D. Harper. Additionally, the U.S. filed with the court Public Comments on Proposed Settlement Agreement. Debtors' motion was originally opposed by Hon Industries, Inc. and also Morfontaine Properties, but both of these objections have been resolved and withdrawn. The major response received by the U.S. after publication of the Settlement Agreement was from entities which identified themselves as "Certain Members of the Jasper and Cherokee County Site PRP Groups." These entities are substantially the same as the parties that we shall hereafter identify as the Objecting PRPs, who filed objections in this court. The positions which the Cherokee and Jasper commenting parties stated opposing approval of the Settlement Agreement after publication of the Settlement Agreement in the *Federal Register*, are sub-

stantially the same as those filed by the Objecting PRPs in this court. This background makes comprehensible the presentation by the U.S. in this court in support of its motion, for such presentation deals only with the specific Liquidated Sites at Cherokee County, Kansas, and Jasper County, Missouri, though many other sites are also dealt with in the Settlement Agreement. The Objecting PRPs are six creditor claimants, Brown and Root, Inc., Sun Company, Inc./Sun Company, Inc. (R and M), USX Corporation, E.I. DuPont Nemours and Company, the Doe Run Resources Corporation, and AMAX, Inc. The Objecting PRPs oppose debtors' motion and object to approval of the settlement. The Objecting PRPs support their position with a memorandum and also the affidavit of Gary Uphoff. In addition, the Unsecured Creditors' Committee ("UCC") objects to approval of the Settlement Agreement.

A hearing was held on the present motions at which time arguments on behalf of the debtors, of the U.S., of the Objecting PRPs, and of the Unsecured Creditors' Committee, were heard.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A) and (B).

## II. Government Claims

In the consolidated bankruptcy cases, the U.S. filed proofs of claim on behalf of the EPA which assert that debtors are jointly and severally liable for costs incurred and to be incurred in regard to releases of hazardous substances into the environment ("response costs") at 24 "Liquidated Sites" (so identified in the Settlement Agreement), and also for natural resource damage on behalf of the DOI relating to certain sites. Thus, it will be understood that the U.S. is asserting two kinds of claims. It asserts claims for response costs on behalf of EPA. It asserts claims for natural resource damage on behalf of DOI. While the parties have used other and additional terms in discussing EPA claims, herein we will use the phrase "response costs" to generally refer to the claims

of the EPA. Among the Liquidated Sites are the Cherokee County Super Fund Site in Cherokee County, Kansas, which has Baxter and Treece subsites, and the Jasper County Site in Missouri. These sites are mentioned specifically because they will enter into the subsequent discussion.

Proofs of claim of the U.S. also allege that debtors are liable for a civil penalty of up to $25,000.00 per day per violation in connection with an industrial facility in Colorado Springs, Colorado, under the Clean Water Act, 33 U.S.C. §§ 1319(e) and 1317(d). This claim was dealt with in a lawsuit in the District of Colorado which was settled subsequent to the petition date, and approved by the United States District Court for the District of Colorado on September 24, 1992, and by the bankruptcy court on November 18, 1992. Another proof of claim of the U.S. is a consent decree regarding litigation under the Clean Water Act in a case which arose in Missouri. A consent decree was entered in the District Court in Missouri.

Additionally, the states of Arizona, Oklahoma and Michigan have filed proofs of claim which allege that one or more of the consolidated debtors are PRPs at certain sites as to which liability has arisen for response costs and natural resource damages.

## III. The Settlement Agreement—Derivation of Provisions

Debtors, the U.S., and the States of Arizona, Oklahoma and Michigan entered into negotiations in which they addressed the issues which involve 24 Superfund sites where debtors are alleged to have some liability. As a result of these negotiations, these parties entered into the Settlement Agreement. (While Arizona is a signatory to the Settlement Agreement, no claim is allowed to it therein. Its signature indicates its acquiescence to procedures as to any future liabilities.)

The Settlement Agreement resolves the environmental-related claims of the United States, whether now known or hereafter arising. First, with respect to 23 specified Liquidated Sites, debtors have agreed to provide to the United States on behalf of the EPA (i)

allowed general unsecured claims in the aggregate amount of $37,018,000 and (ii) an allowed administrative expense claim in the amount of $150,000 in full settlement of the debtors' alleged liability to EPA at those sites. The $150,000 administrative expense claim relates to expenses incurred by the EPA for response costs at property owned by debtors at the Cherokee County Site. Second, in settlement of claims by the DOI for natural resource damage at five of the Liquidated Sites, debtors have agreed to provide to the U.S. on behalf of the DOI an allowed general unsecured claim in the amount of $4,008,000. Third, in full settlement of the penalty claims at issue in *United States v. Eagle–Picher Industries, Inc.*, Civil No. 87–5100–CV–SW–8 (W.D.Mo. filed Sept. 29, 1990, modified Jan. 4, 1991), debtors have agreed to provide to the U.S. on behalf of the EPA an allowed unsecured claim in the amount of $1,276,500, seventy-five percent (75%) of which the EPA has agreed to subordinate in the Chapter 11 Cases and the remaining twenty-five percent (25%) of which will have the same status as a general unsecured claim.

The Settlement Agreement allows the State of Michigan a general unsecured claim in the aggregate amount of $600,000 in full resolution and settlement of the debtors' alleged liability at nine sites in Michigan, including eight sites that are among the Liquidated Sites. The Settlement Agreement allows the State of Oklahoma a general unsecured claim in the amount of $946,500 in full settlement and resolution of the debtors' alleged liability at one site that is also one of the Liquidated Sites.

In exchange for the foregoing allowed claims, the U.S. and the States have covenanted not to sue debtors or their successors and assigns under CERCLA (Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., the Superfund) or RCRA (Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.) for any costs incurred or to be incurred with respect to the Liquidated Sites. Furthermore, debtors are entitled to full protection from claims for contribution by any party for any past or future cleanup or other response costs or natural resource damage at the Liquidated Sites.

Pursuant to the Settlement Agreement, environmental liabilities arising after the petition date will not be discharged in the Chapter 11 Cases. Similarly, certain environmental liabilities arising with respect to "Debtor–Owned Sites" (defined to mean properties or sites owned by any of the Debtors at or at any time after the effective date of a chapter 11 plan) will not be discharged in the Chapter 11 cases.

The Settlement Agreement also addresses sites other than the Liquidated Sites and the Debtor–Owned Sites by compromising the contentious issue of whether governmental claims for response costs or natural resource damage at sites not currently being addressed by a governmental agency, but where the contamination arose prepetition, are dischargeable in bankruptcy. The Settlement Agreement provides that claims arising from prepetition acts or omissions with respect to "Additional Sites" (viz., sites other than the Liquidated Sites and the Debtor–Owned Sites) will not be discharged, but may be asserted by the U.S. or the States as and when they arise. If one of the debtors is determined to be liable, however, its payment to the government will be the same as it would have been had the liability for the Additional Site been liquidated in the Chapter 11 cases and treated as an allowed general unsecured claim under a confirmed plan in the Chapter 11 cases.

Further, in the Settlement Agreement, debtors have reserved all of their arguments and defenses under applicable environmental laws with respect to any claims that may be asserted against them at any of the Additional Sites, and the U.S. and the States have agreed to negotiate fair and equitable terms in settlement of any claims arising at an Additional Site.

Because this decision is much involved with the Cherokee County Site and its Baxter Springs and Treece Subsites, as well as another Liquidated Site identified as the Jasper County Site in Missouri, we comment further about them. (Another subsite at Cherokee, the Galena subsite, enters the discussion below.) The record discloses how

the provisions of the Settlement Agreement regarding the Baxter Springs and Treece Subsites of the Cherokee County Site were derived by the settling parties. As will be seen hereafter, the various figures used are based on the declarations of D. Mark Doolan and George Allen, as well as the affidavit of Paul D. Harper, summarized below. The allowed claim at these subsites combined for response costs is $1.7 million, while that allowed on account of natural resource damage is $1.26 million. This statement of allowed claims for the Cherokee County Site are derived from a consideration of para. 4 of the Settlement Agreement, as illuminated by para. 7 of the Declaration of George Allen.

1. Baxter Springs. Debtors' unadjusted contribution based on percentage of tons mined [1] was approximated at 10.7% for the Baxter Springs Subsite. Total past and future response cost for that subsite was estimated to be $6.42 million. Debtors' share would be $687,000.00. The parties to the settlement used a compromise natural resource damages estimate for the Baxter Subsite of $3.5 million, and debtors' share of liability, using the 10.7% figure, would be approximately $375,000.00.

2. Treece. Debtors' contribution based on percentage of tons mined was approximated at 39.2%. Total past and future response costs for this subsite were estimated at $2.72 million. Debtors' share was computed at $1.066 million. Natural resource damage was estimated at $2.25 million. Debtors' share would be $880,000.00.

The total for response cost thus derived for both subsites at Cherokee is $687,000.00 + $1,066,000.00, or $1,753,000.00, about the amount of the allowed claim on this account in the Settlement Agreement. The total for natural resource damage for both subsites at Cherokee, is $375,000.00 + $880,000.00, or $1,255,000.00. This figure, $1,255,000.00, is the portion of the allowed claim for DOI in the Settlement Agreement attributable to the Baxter Springs and Treece Subsites, but ex-

cluding the Galena Subsite. (See Declaration of George Allen, para. 7.)

A like computation was applied for the Jasper Site. The Settlement Agreement provides an allowed claim on account of response costs of $2.8 million, and an allowed claim of $424,000 on account of natural resource damage. No issue is made by the Objecting PRPs as to the amount of the allowed claim for natural resource damage, and so we do not discuss it further. As to the response cost amount, it was derived as follows. Debtors' unadjusted share of tons mined for the Jasper Site based on records available from the Bureau of Mines is between 1.8% to 3.9%. However, for purposes of the overall compromise reached for this site, debtors' share was adjusted to 9.2%. This upward adjustment was made in exchange for the U.S. agreement to use a lower range estimate for future response costs, and further in light of orphan shares [2] and the fact that the Bureau of Mines statistics were unavailable for earlier time periods. For purposes of the settlement, response costs for the Jasper Site are estimated to be $28.75 million. Applying the 9.2% factor yields the amount $2.6 million as debtors' share of liability for response costs for the Jasper Site.

## IV. The Motions of Debtors and the U.S.

As we have said, debtors and the U.S. have filed separate motions seeking approval by the court of the Settlement Agreement. The motions are different in character. The motion of debtors is fashioned to deal with the requirements of settlement pursuant to FRBP 9019. The motion of the U.S. is designed as a CERCLA event.

### A. Debtors' Motion

To carry their affirmative burden, debtors have moved for approval of the Settlement Agreement. They urge the following as reasons in support of their motion.

---

1. The technique employed estimated debtors' percentage of all mining activity at a site over the entire period of mining activity there, which period in the present instance may have been longer than a century.

2. For purposes of the present discussion, "orphan shares" refers to contamination attributable to no longer existing entities, or entities otherwise unable to respond in damages to environmental claims.

1. If the Settlement Agreement is not approved, debtors would be forced to litigate claims, including those of the U.S. and the states, in the aggregate totaling nearly $2 billion and involving hundreds of interested parties and 24 sites. Each of the sites presents unique factual and legal issues. The expense of such litigation would be great.

2. The Settlement Agreement deals with unknown Additional Sites. The agreement provides that these will be dealt with when they come to light, but the claims will be paid as those of general unsecured creditors in plan dollars. This provision will avoid further major litigation such as has had to be dealt with in other cases.

3. The U.S. and the states filed proofs of claim seeking approximately $100 million in damages for less than ten sites. The Settlement Agreement provides for settlement of debtors' liability at 24 sites for approximately $43 million in claims, less than half the amount of the claims.

4. The technique in negotiating the Settlement Agreement was to analyze the total volume of waste at each of the Liquidated Sites, and to make a reasonable estimation of the percentage of that total attributable to debtors. That percentage was then applied to total past and estimated future costs of cleanup at the site, to determine the amount of cost which should be charged to debtors. This process has taken over three years. The alternative to the resolution of the claims at the Liquidated Sites as provided in the Settlement Agreement, would be litigation having for its purpose the fixing by a court of the values which the parties have estimated. There is no reason to believe that a better result for any of the parties to the Settlement Agreement could be achieved through such litigation. By entering the Settlement Agreement the parties have avoided the expense and delay inevitable in such litigation.

5. The Colorado Springs settlement must be viewed separately. That settlement disposes of criminal charges as well as civil claims resulting from an investigation of debtors' Electronics Division in Colorado Springs. The Settlement Agreement requires that debtors plead guilty to two crimi-

nal misdemeanors, and allow a prepetition general unsecured claim to the U.S. in the amount of $300,000.00. Additionally, a further general unsecured claim in the amount of $200,000.00 is allowed EPA's Region VIII. It is significant that the settlement of the Colorado Springs matter involves agreement by the U.S. not to debar or suspend debtors from government contracts. This is a significant benefit for debtors because much of the work of the Electronics Division is with federal agencies. The settlement, of course, avoids the incurring of the substantial expense of litigation of the issues involved, and avoids the uncertainties as to the outcome of any litigation.

## B. The Motion of the U.S.

The separate motion of the U.S. for approval of the Settlement Agreement, in part, restates bases advanced by the debtors in their motion. That is, the U.S. points out that the settlement is based on an analysis of debtors' contribution to the contamination at the several sites involved, and therefore the settlement is "roughly correlated with, some acceptable measure of comparative fault," apportioning liability to debtors "according to rational (if necessarily imprecise) estimates" of their fair share of liability for a site, criteria derived from U.S. v. Cannons Engineering, 899 F.2d 79, 87 (1st Cir.1990).

While the U.S. has filed a motion for approval of the Settlement Agreement, its motion is somewhat anomalous because it is really designed to rebut the positions of the Objecting PRPs of which it had been apprised during the public comment process as well as in the filing by the Objecting PRPs in opposition to the motion by debtors in this court. Thus, the U.S. directs its motion at the specifics of the Cherokee Site and of the Jasper Site. In connection with such matters, it has filed with its motion the declarations of D. Mark Doolan, and George Allen, as well as the affidavit of Paul D. Harper.

In his Declaration, Doolan identifies himself as a Remedial Project Manager in the Superfund Division of the United States Environmental Protection Agency. He is a Registered Professional Geologist in Arkan-

sas since 1989. The primary purpose of Doolan's Declaration was to present an estimate of the cost of remediation for the Jasper County Site. He estimated that response costs might range from $15,000.00 per acre up to $25,000.00 per acre, though the latter figure should be discounted. He then estimated total response costs as ranging from $20 million to $112 million. (Each of these figures has two components. The first is the number of mine waste piles which would be cleaned up. The second is the costs per acre.) Doolan explained how he developed these figures. He said that the Jasper County Site is an inactive lead and zinc mining area. He reviewed pertinent data and estimated that contaminants covered 8,966 acres and consist of approximately 8,818,922 cubic yards. To estimate costs for Jasper, he considered response costs incurred or to be incurred at two places. The first is estimated costs from the proposed plan for remediation at the Baxter Springs and Treece Subsites of the Cherokee County Site. The second is the actual cost of remedial action at the Galena Subsite of the Cherokee County Site. (He was the remedial project manager in charge of response activities at these three sites.)

In his Declaration, George Allen identifies himself as a contaminants specialist employed by the Fish and Wildlife Service of the DOI. He holds a Ph.D. in zoology and a Masters of Science in environmental science. He was involved with the Cherokee County Site, and his task was to evaluate the natural resource damages there. He estimated the range of natural resource damages for the Cherokee County Site, including Galena, Baxter Springs, and Treece Subsites, to be approximately $16 million to $54 million. For the Baxter Springs Subsite alone, the range is $3.5 million to $11.4 million, and for the Treece Subsite, $2.25 million to $7.6 million. Allen says that the amount of the DOI allowed claim for the Cherokee Site was $3 million, of which $360,000.00 was allocated for Baxter Springs, $900,000.00 for Treece, and $1,740,000.00 for Galena.

The U.S. also filed the affidavit of Paul D. Harper, who says that he is the Director, Environmental Affairs and Safety for Eagle-Picher Industries, Inc., and has been in that position since 1986. His affidavit deals with the allocation of mined materials attributable to debtor at the Cherokee and Jasper Sites, as well as another Liquidated Site, Cedartown. Harper says that Eagle–Picher and its predecessors have conducted mining operations in the subject area from approximately the 1840's to the 1950's. He makes the point that in May, 1990, Eagle–Picher and several other PRPs entered into an administrative consent order with the EPA for the performance of a remedial investigation/feasibility study ("RI/FS") for the Baxter Springs and Treece Subsites at Cherokee. The PRPs allocated costs on the basis of total ore production at each of the subsites of Cherokee. The percentages assigned to each PRP "were then adjusted upward to account for 'orphan shares' attributable to PRPs who were insolvent or no longer in business." Harper points out that the agreement between the PRPs at Cherokee expressly provides that allocation determinations therein "shall not be construed to be applicable or presumptive with regard to matters not covered by this agreement." According to the agreement between the Cherokee PRPs, 10.7% of total rock tons mined was attributable to Eagle–Picher. The allocation percentage of costs for Baxter Springs for Eagle–Picher was increased to 20% to account for orphan shares. At Treece, 39.2% was attributable to Eagle–Picher in the agreement, and the percentage was increased to 52% to account for orphan shares.

Harper stated as to the Jasper County Site that approximately 1.8% of rock tons mined is attributable to Eagle–Picher operations. At Jasper, a large proportion of total crude ore production is attributable to PRPs who are insolvent or no longer in business, i.e., entities to which orphan shares are attributable. Eagle–Picher's percentage of rock tons mined by viable PRPs is 8.1%, and of the four largest viable PRPs, including Eagle–Picher, is 9.2%. A further figure related by Harper has to do with a notice sent by EPA to Eagle–Picher and 13 other PRPs with regard to Jasper. This letter referred to data prepared by the Bureau of Mines, and of the 14 PRPs who received that letter,

268

approximately 3.9% of rock tons mined were attributable to Eagle–Picher.

## C. Response of Objecting PRPs

The Objecting PRPs have lodged an extensive memorandum in opposition to the motion of debtors coupled with the affidavit of Gary Uphoff. In his affidavit, Uphoff says that he is co-founder and principal of Environmental Management Services Company ("EMS"), the business of which is providing environmental and permitting services to the mining industry. Uphoff says that he has a decree in biology and a Masters Degree in Limnology. He serves as project coordinator for the Jasper and Cherokee Sites. He states as to debtors' share at Cherokee, that the PRPs developed an allocated share of liability for each company based primarily on total ore production. He says that based upon that agreement, debtors' share of production at Baxter Springs was approximately 20% and the share of production at Treece was approximately 80%. He says that these percentages related to liability of the PRPs for the RI/FS, and the parties agreed to a blended share of 52% for debtors.

For oversight costs (a part of response costs), based on share of production, debtors would be liable for 58%, but this figure was reduced to 35% by agreement. He then projects that response costs for future remediation would be divided among the PRPs in the same fashion, so that debtors' share in Baxter Springs and Treece would be approximately 20% and 80% respectively. Uphoff then states that the Cherokee PRP group has expended $2,601,310.00 in connection with the preparation of the RI/FS for Baxter Springs and Treece. Debtors' 52% share of this would be $1,352,681.20. Uphoff then says that the EPA has released a Plan for Cherokee and the "preferred remedy is estimated to cost $4,801,714.00 for the Baxter Springs and $1,124,056.00 for the Treece Subsite." Applying the 20% and 80% shares, which should be attributed to debtors, debtors' liability for these subsites would respectively be $960,342.00 and $899,244.00. He then says that PRPs have paid $384,492.00 for oversight costs for Baxter Springs and Treece for 1991–92, and "had EPI continued

to participate," their 35% share would have been $134,572.00. Further, with respect to Cherokee, the DOI's preliminary estimate for natural resource damages is $54,144,300.00. Applying the 52% figure, debtors' approximate share of that would be $28,155,036.00.

Turning now to Jasper, Uphoff says that "[b]ased upon the formula developed for cost allocation" a blended compromise rate of 13.4% was developed applicable to the RI/FS and oversight costs. He then states his belief that this percentage should be applied to determine the proper share attributable to debtors for future response costs. Uphoff then applies the 13.7% figure, and arrives at the following figures for Jasper: $731,997.06 attributable to debtors for preparation of the RI/FS; $210,884.00 for future costs related to the RI/FS; $235,725.00 for oversight costs; $13,133,250.00 for debtors' share of future response costs; $75,283.00 for debtors' share of natural resource damages.

The Objecting PRPs, on the basis of the Uphoff affidavit, take issue with the estimates used by the settling parties both of the value of response cost claims and of natural resource damage claims for the Cherokee Subsites, and also the percentages which the settling parties applied to those figures. Using Uphoff's figures, the Objecting PRPs arrive at a total for Cherokee on account of the EPA claim of $3,434,000.00. This is approximately twice the amount of the allowed claim at Cherokee on this account in the Settlement Agreement.

On the same basis, the Objecting PRPs say that natural resource damages at Cherokee attributed to debtors is $28,155,036. This, Objecting PRPs contrast to the $1,255,000.00 allowed claim in the Settlement Agreement on account of natural resource damages at Cherokee. For the Jasper Site, as to response costs, the Objecting PRPs arrive at a total of $14,311,000.00, which they assert should be the measure of debtors' liability. The Objecting PRPs contrast this to the $2,800,000.00 allowed in the Settlement Agreement on account of the EPA response costs at Jasper.

## V. Fairness

### A. Applicable Legal Standards

■ As we begin our consideration of the controversy here presented, we consider the standards which are to be applied in reaching a decision. While the U.S. and the Objecting PRPs have diametrically opposed views about whether the Settlement Agreement before the court should be approved, they do agree about one thing. Both assert that special considerations must enter into the decisional process because what is before the court is a settlement pursuant to CERCLA. While they agree about the applicability of that statute, they are not in agreement as to its impact. The Objecting PRPs assert that CERCLA requires that this court do an intensive and minute examination of the events surrounding the Settlement Agreement. The U.S. asserts that the impact of CERCLA is different. The U.S. urges that approval of the Settlement Agreement is within the discretion of the reviewing court, and in exercising that discretion, the reviewing court is to do so in a limited and deferential manner.

The position of the U.S. is an accurate statement of the law in this circuit. *See U.S. v. Akzo Coatings of America, Inc.,* 949 F.2d 1409 (6th Cir.1991). In *Akzo,* the U.S. entered into a consent decree with various PRPs for cleanup pursuant to CERCLA. The consent decree was attacked by the State of Michigan. In that case, the Sixth Circuit had occasion to address the question of standard of review by the initial reviewing court of the consent decree. The court said:

> ... Ours should not be the task of engaging in a de novo review of the scientific evidence pro and con on each proposed remedy in the hazardous substance arena. The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff. "When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). Our

role, as the CERCLA statute makes clear, is one of review on the administrative record, searching for errors of procedure and for glaring omissions or mistakes which indicate that EPA has acted arbitrarily and capriciously. As the House Report on the SARA amendments notes: "limiting judicial review of response actions to the administrative record expedites the process of review, avoids the need for time-consuming and burdensome discovery, reduces litigation costs, and ensures that the reviewing court's attention is focused on the criteria used in selecting the response." H.R.Rep. No. 253, Pt. 1, 99th Cong., 1st Sess. 81 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2863. When reviewing a consent decree, a court need only "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." H.R.Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. at 19 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3038, 3042 [hereinafter "H.R.Rep. No. 253, Pt. 3"].

*U.S. v. Akzo Coatings of America, Inc.,* 949 F.2d at 1424. It is our view, notwithstanding that it is not a consent decree before us, but consideration of a settlement agreement entered into by the U.S. pursuant to CERCLA, that the same standard of review applies in the present situation. Debtors' motion arises pursuant to FRBP 9019 which authorizes this court to approve a settlement after notice and a hearing. The requirements of FRBP 9019 for deciding whether to approve a settlement are not inconsistent with the *Akzo* standard.

### B. Conclusions re Fairness

■ We have now summarized the provisions of the Settlement Agreement relevant to the Cherokee and Jasper Sites, the explanation of the settling parties as to how these provisions were derived, and the contentions of the Objecting PRPs attacking those provisions as unfair. The question now to be faced is not whether the settling parties are correct or whether the Objecting PRPs are correct, for in this exercise we do not resolve questions of fact. *In re Media Central,* 190

B.R. 316, 321 (E.D.Tenn.1994); *In the Matter of Equity Funding Corp.*, 416 F.Supp. 132, 146 (C.D.Cal.1975). Rather, our task is to "review ... the administrative record", and to search "for errors of procedure and for glaring omissions or mistakes which indicate that EPA has acted arbitrarily and capriciously", the *Akzo* standard. We will first consider whether the debtors and the U.S. have made a showing sufficient to meet the *Akzo* standard. We will then consider whether, not withstanding the showing by debtors and the U.S., the grounds stated by the Objecting PRPs compel a conclusion that that standard has not been met.

■ It is clear from the declaration of Doolan and Allen, together with the affidavit of Harper, that their work comprises the administrative record. This is so because the provisions of the Settlement Agreement have a direct relationship to the facts, analyses, and opinions, of these affiants. They made a rational evaluation of contamination at the several sites, and also an evaluation of the contribution of debtors to that contamination. This was the basis for the Settlement Agreement. That it is entirely appropriate for the U.S. to have relied on these affiants is clear from their qualifications as experts in fields relevant to the present subject matter. We have examined the administrative record in some detail. We find no errors of procedures, omissions, or mistakes, and find that in entering into the Settlement Agreement, the U.S. has not acted arbitrarily and capriciously. We couple with this finding, a holding that the reasons in support of their motion (pp. 11–13 above) by debtors are well taken. We conclude that debtors and the U.S. have made a prima facie showing warranting approval by this Court of the Settlement Agreement. Further, we find that the objections of the Objecting PRPs are insufficient to overcome such prima facie showing. We reject the positions of the Objecting PRPs for the following reasons:

1. *Response Costs—Cherokee.* Though there are differences in the estimates of response costs as between the settling parties and the Objecting PRPs, the major difference between the value for response costs at Cherokee urged by the Objecting PRPs and what appears in the Settlement Agreement, is due to the very substantial differences in the percentages employed by the respective parties for response costs at Cherokee. The 52% figure as utilized by the Objecting PRPs is flawed. There is no rational basis for applying that percentage to future response costs. That figure was negotiated prepetition relative to the cost of the RI/FS at Cherokee, and there was no contemplation by the parties that it would be used for any other purpose. Indeed, the fact that it was a figure negotiated by the debtors and the Cherokee PRPs is disarmed by the express statement in the agreement of the parties that that figure was not to be applied other than for a limited purpose which does not include future response cost. The 52% figure further is invalid because there has been omitted from the computation resulting in that percentage, amounts of contamination which originated with entities which no longer exist or for other reason cannot contribute to cleanup costs ("the orphan shares"). Inclusion of PRPs responsible for orphan shares would substantially reduce that percentage.

2. *Natural Resource Damage—Cherokee.* With respect to the claim for natural resource damage at Cherokee, the figures advanced by the Objecting PRPs are flawed in two respects.

(a) The estimate of the Objecting PRPs of such damage includes not only amounts for the Baxter Springs and Treece Subsites, but also an amount for the Galena Subsite at Cherokee. The figure in the Settlement Agreement to which the Objecting PRPs make their comparison, however, only includes damages for Baxter Springs and Treece. The Galena Subsite is dealt with separately in the Settlement Agreement.

(b) The basis for applying a 52% factor by the Objecting PRPs to determine debtors' allocable share of natural resource damages is the Uphoff affidavit. In that affidavit, Uphoff provides no basis for using that figure for natural resource damage. It is entirely arbitrary. The use of the lower range of the estimate for natural resource damages for the Baxter Springs and Treece Subsites at Cherokee is a reasonable compromise po-

sition by the settling parties. It takes into account what debtors would contend upon litigation, for it is obvious that debtors then would assert that their liability could be established only if natural resource damages were connected to their particular mine wastes, and clearly there would be difficulties of proof about that.

3. *Response Costs—Jasper.* As to Jasper, it must be noted preliminarily that pursuant to Bureau of Mines records, debtors' unadjusted share of tons mined is between 1.8% and 3.9%. In negotiation, the settling parties agreed to use a higher figure, 9.2%, offsetting this with a lower range estimate for future response costs. The parties then agreed for purposes of settlement to use a figure of $28.75 million for past and future response costs at Jasper. The Objecting PRPs fault the settlement both as to response cost estimates and percentage attributable to debtors, but in both respects their objections are unsupported. The Uphoff affidavit provides no authoritative basis for the estimate (para. 19) of $97,500,000.00 for future response cost at Jasper. Furthermore, application of a 13.47% figure for future response cost is pure speculation on the part of Uphoff. In any case, the figures for percentage and for cost of response utilized by the Objecting PRPs do not take into account the fact that settlements involve negotiation, and it is not reasonable to compare a negotiated figure arrived at by the settling parties with a figure selected by the party to be the most favorable which it could assert on its own behalf.

This court holds that the Settlement Agreement is fair, and will be approved.

## VI. Other Grounds for Objection

In addition to fairness, we must deal with a number of other issues raised by the Objecting PRPs, by the UCC, and by debtors in their motion.

1. The Objecting PRPs opposed the motion of the debtors on grounds that it is premature. The basis for that motion is that correct procedures require that there be publication, and opportunity for public comment, and a public meeting, all of which is required to occur prior to the time that the government files a motion for approval of the settlement.

This basis for objection by the Objecting PRPs has been made moot. The objection was made in response to the motion by debtors. Subsequently, the U.S. filed its motion, but only after it had fully complied with all of the requirements to which reference was made by the Objecting PRPs. This basis for objection by the Objecting PRPs is overruled.

2. Another basis for objection by the Objecting PRPs was that debtors' motion should be "transferred" to the District Court. This basis for objection also is without foundation. This court has jurisdiction to decide the question presented by debtors and the U.S. in their respective motions pursuant to the General Order of Reference to which we have earlier alluded. This basis for objection by the Objecting PRPs is overruled.

3. The Objecting PRPs object to the Settlement Agreement provision at para. 5A:

A. Only the amount of cash received by EPA (or net cash received by EPA on account of any non-cash distributions) from the Debtors under this Settlement Agreement for the Allowed General Unsecured Claim for a particular site or subsite, and not the total amount of the allowed claim, shall be credited by EPA to its account for a particular site or subsite, which credit shall reduce the liability of non-settling potentially responsible parties for the particular site or subsite by the amount of the credit.

(We assume that the objection extends as well to paras. 5B and 5C, both of which also limit the credit applied for nonsettling PRPs to cash received by the U.S.)

■ The Objecting PRPs object to this provision, asserting that they should be credited with the amount of the allowed claim of the U.S., rather than the amount of cash received on such claim or claims. The basis for the argument by the Objecting PRPs essentially is that the Objecting PRPs will become liable for the difference between the amount of the allowed claim and the amount of cash received by the government. This, say the Objecting PRPs, is unfair to them

because the Superfund should have to bear this cost rather than the Objecting PRPs. They assert that the scheme of the Settlement Agreement penalizes them for cooperating with the government and rewards debtors for not doing so.

The U.S. has responded to this objection by the Objecting PRPs. We find its response persuasive. The U.S. points out that pursuant to CERCLA the Objecting PRPs could be jointly and severally liable for contamination at the several sites. Following the argument of the Objecting PRPs to its logical conclusion, the U.S. points out that the position of the Objecting PRPs would tend to cause the U.S. not to proceed to settlements with bankrupt debtors if other PRPs were credited with more than the actual cash received by the U.S. upon settlement with a bankrupt debtor. Simply ignoring bankrupt debtors would be more productive for the U.S., for it could, in view of joint and several liability, expect fully to collect from viable nonbankruptcy debtors.

The Objecting PRPs attempt anticipatorially to offset the basic premise that they are exposed to joint and several liability by pointing to authority that limits joint and several liability in some instances. This court notes that by making this point, the Objecting PRPs concede that they are exposed to joint and several liability. We find, however, that the argument that they make that the doctrine of joint and several liability might be limited is entirely offset by the point made by the U.S. that it is beneficial to all concerned for the U.S. to settle with debtors who are in bankruptcy, even though the amount credited to a cleanup is limited to the cash received by the U.S.

A further telling point made by the U.S. is that there remains in the future the possibility that the U.S. will negotiate a settlement with the Objecting PRPs that forgives some of the cleanup costs for which they would otherwise be liable.

This basis for objection by the Objecting PRPs will be overruled.

4. Another basis for objection by the Objecting PRPs is that the Settlement Agreement contains no reopener provision, and such a provision is required by CERCLA. Neither debtors nor the U.S. disagrees that there is no reopener provision in the Settlement Agreement. We find the objection, however, to be without merit.

■ CERCLA does not require a reopener upon settlement of a claim with a bankrupt debtor; CERCLA requires reopener only where there is a settlement in which the parties settling with the U.S. undertake response action themselves. *U.S. v. Hercules, Inc.*, 961 F.2d 796, 799 (8th Cir.1992); *Arizona v. Nucor Corp.*, 825 F.Supp. 1452, 1463 (D.Ariz.1992). Furthermore, a bankruptcy discharge for a debtor would bar the U.S. from the kinds of claims which might be embraced by a reopener provision rendering such a requirement meaningless in a bankruptcy context.

The objection of the Objecting PRPs on this ground is overruled.

5. As part of its unfairness argument, the Objecting PRPs argue that the matters covered by para. 24 of the Settlement Agreement under the Contribution Protection, ought not to be permitted. The provision of the Settlement Agreement in question provides:

24. With regard to all existing or future third-party Claims against the Debtors with respect to the Liquidated Sites, including claims for contribution, the parties hereto agree that the Debtors are entitled to such protection from actions or Claims as is provided by Section 113(f)(2) 42 U.S.C. § 9613(f)(2), Section 12c(5) of MERA, Mich.Comp.Laws § 299.612c(5), and all analogous Oklahoma laws (as may be provided more specifically by any Disallowance Order).

It appears to this court that the Objecting PRPs do not here state a separate basis for objecting to the Settlement Agreement. All that is provided in para. 24 of the Settlement Agreement is that debtors are entitled to the protection provided by statute. The extent of that protection is a question discussed hereafter in regard to whether the claims of the Objecting PRPs should be disallowed. Accordingly, we make no separate ruling on

what the Objecting PRPs present as a discrete basis for objection.

6. Objections of the Unsecured Creditors Committee.

■ (a) The first objection of the UCC is that "The Settlement Agreement fails to take advantage of a probable change in law that would eliminate most of the debtor's environmental liability." UCC Obj. at 2. The UCC argues that the provisions of CERCLA which assess "retroactive liability" against past owners and operators of contaminated property will likely be amended in the future. The UCC asserts that such amendments by Congress would eliminate a substantial portion of Eagle–Picher's liability under the law. As a result, the UCC suggests that this court should delay the approval of the Settlement Agreement until the law is changed, or, in the alternative, that we should condition approval of the Settlement Agreement on a further agreement by the United States and the States that whenever the law is amended, the amendments would apply to the agreement. The UCC's objection in this regard is without merit for two reasons.

First, the parties and attorneys who negotiated this settlement were free to research pending CERCLA amendments and to assess both the likelihood of the passage of those amendments, as well as the effect that those amendments might have of the liability of Eagle–Picher. *See e.g., In re Lyons Transportation Lines,* 163 B.R. 474, 476 (Bankr.W.D.Pa.1994) (approving a settlement entered into while legislation was pending that would have affected the parties relative positions because "[b]oth counsel ... were free to conduct research on the proposed legislation prior to the agreement.... The agreement which the parties entered into was appropriate at the time considering the range of probabilities, the degree of uncertainty, and the costs of continued litigation"). For the UCC to suggest that the possibility of a change in CERCLA was not taken into account in this settlement is tantamount to suggesting that the parties involved were unaware that CERCLA even existed. We cannot accept the thought that arms-length negotiations between Eagle–Picher and the EPA did not take into account the possibility of a change in the law. The parties were certainly well informed about the law, and free to factor the potential amendments into the settlement value which was ultimately agreed upon.

(b) Second, this court is under an obligation to apply the law as it now exists. *Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (stating that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary"). In light of this, we cannot accept the UCC's position that this court should conditionally approve a settlement based upon a law which might never be enacted. We must make an assessment of the fairness of this Settlement Agreement under the present law. To do otherwise would suggest that the parties and this court can accurately predict the future actions of Congress. We simply will not allow, nor engage in, such conjecture.

We hold that the UCC's objections will be overruled.

## VII. Disallowance of PRP Claims

■ With their motion for approval of the Settlement Agreement, debtors have included a request for further relief. That further relief is a request that this court enter an order dismissing and/or disallowing all PRP claims. If there are PRP claims on file, in addition to those of the Objecting PRPs, it would violate due process for this court to grant relief against them without giving the claimants an opportunity to be heard. We therefore interpret this request for relief by the debtors as limited to the proofs of claim of the Objecting PRPs. Further, we regard this requested relief as an objection to claims pursuant to FRBP 3007. The Objecting PRPs have responded to debtors' objection without demur, and we therefore regard the issue as properly before the court.

With their memorandum on the present motion, the Objecting PRPs have included as Exhibit A an amended proof of claim for Sun Company, Inc./Sun Refining and Marketing

Company, one of the Objecting PRPs. The Objecting PRPs did not include amended proofs of claim for all of them, but offered that of Sun as an example of all of them. We therefore will assume that the following discussion dealing with the proofs of claim of all of the Objecting PRPs can properly be based on that of Sun. Sun's amended proof of claim contains the following explanation:

3. These claims are generally unsecured claims entitled to priority, pursuant to 11 U.S.C. § 507(a)(1). The bases for the claims set forth in the attached Proof of Claim are, as follows:

a. *Claim No. 1*—As of May 1, 1995, Claimant directly expended a total of $2,601,309 in satisfaction of the Debtor's outstanding response costs due and owing under the Consent Order and Group Agreement in connection with the determination of the nature and extent of contamination and any threat to the public health, welfare, or the environment caused by any release or threatened release of hazardous substance, pollutants or contaminants ("Cherokee RI/FS") from the Baxter Springs and Treece Subsites, Cherokee County, Kansas ("Cherokee Sites");

b. *Claim No. 2*—Claimant has directly incurred $384,492 for oversight costs and anticipates directly expended, in the next few months, an additional approximately $250,000 in further satisfaction of the Debtor's payment obligations for oversight costs in connection with the completion of the Cherokee RI/FS;

c. *Claim No. 3*—Claimant might have to directly incur $5,925,767 in future response costs in connection with any remedial actions necessary to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants from the Cherokee Sites, which direct costs or a portion thereof would be recoverable from the Debtor pursuant to, *inter alia,* 42 U.S.C. § 9607(a)(4)(B);

d. *Claim No. 4*—Claimant might have to directly incur $54,144,300 in future response costs to compensate for alleged natural resource damages at the Cherokee Sites;

e. *Claim No. 5*—As of May 1, 1995, Claimant directly expended a total of $5,434,276 in connection with the performance of the Jasper County RI/FS, which direct costs or a portion thereof would be recoverable from the Debtor pursuant to, *inter alia,* 42 U.S.C. § 9607(a)(4)(B);

f. *Claim No. 6*—Claimant anticipates directly expending approximately $1,565,-583 in connection with the completion of the Jasper County RI/FS, which direct costs or a portion thereof would be recoverable from the debtor pursuant to, *inter alia,* 42 U.S.C. § 9607(a)(4)(B);

g. *Claim No. 7*—Claimant anticipates directly expending $1,750,000 for oversight costs in further satisfaction of the debtor's payment obligations in connection with the completion of the Jasper RI/FS;

h. *Claim No. 8*—Claimant might have to directly incur $97,500,000 in future response costs in connection with any remedial actions necessary to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants from the Jasper County Sites, which direct costs or a portion thereof would be recoverable from the Debtor pursuant to, *inter alia,* 42 U.S.C. § 9607(a)(4)(B);

i. *Claim No. 9*—Claimant might have to directly incur $558,900 in future response costs to compensate for alleged natural resource damages at the Jasper Subsites.

Debtors move that the claims of the Objecting PRPs be disallowed on two grounds. First, they argue that they are entitled to such relief because of the terms of the Settlement Agreement coupled with CERCLA § 113(f)(2) (42 U.S.C. § 9613(f)(2)). Debtors' alternative basis for such relief is more limited in that it relates only to so much of the claims of the Objecting PRPs as remain contingent. Such alternative basis is pursuant to § 502(e)(1)(B) of the Bankruptcy Code.

1. *CERCLA § 113(f)* (42 U.S.C. § 9613(f)). This statute provides:

**(f) Contribution**

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

**(2) Settlement**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(3) Persons not party to settlement**

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

(B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

(C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

Debtors and the U.S. in the Settlement Agreement have expressly agreed to protect debtors from CERCLA claims by other PRPs. They have thereby complied with CERCLA § 113(f)(2), which authorizes and makes effective such agreements. Debtors say that the statute in combination with the Settlement Agreement, bars contribution claims for all past and future costs of cleanup which have been the subject of the Settlement Agreement.

While contribution claims are barred, by its terms the Sun proof of claim is not for contribution. It will be seen that in each of the several categories set out on the proof of claim, Sun asserts a claim for the full amount of, e.g., the RI/FS claim at Cherokee, oversight costs at Cherokee, future response costs at Cherokee, etc. (See pp. 19 and 20 above.) Express reference is made in the proof of claim to 42 U.S.C. § 9607(a)(4)(B) (CERCLA § 107(a)(4)(B)) as the basis for the claim. Because of this, the Objecting PRPs assert that theirs are not contribution claims and therefore not barred by § 113(f)(2).

■ Debtors and the Objecting PRPs present opposing arguments on this issue which can be briefly summarized. Debtors assert that as a matter of law the only recourse which a PRP has against another PRP under CERCLA is a contribution claim. The Objecting PRPs contend that the law is otherwise, and they as parties who have expended funds for CERCLA purposes are entitled to pursue debtors in the full amount of their expenditures pursuant to CERCLA § 107(a)(4)(B).

We hold that in this dispute, debtors are correct. The only recourse of the Objecting PRPs against debtors is by way of a contribution claim. Simply stated, any other conclusion would read § 113(g)(3), the three-year statute of limitations for contribution claims, out of the statute. Every Court of Appeals which has considered this question has reached this conclusion. *United States v. Colorado and Eastern R.R.*, 50 F.3d 1530, 1536 (10th Cir.1995); *United Technologies*

*Corp. v. Browning–Ferris Industries, Inc.,* 33 F.3d 96, 100 (1st Cir.1994), cert. denied —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989). The Objecting PRPs assert that *Velsicol Chemical Corp. v. Enenco, Inc.,* 9 F.3d 524 (6th Cir.1993) reaches a different outcome. That is not so. In *Velsicol,* the question which we are here considering simply was not presented to the Sixth Circuit.

The basis for the conclusion which we reach is well stated by courts in the above cases. Thus, in *United Technologies,* the court reviewed the history of CERCLA, observing that the basic enactment in 1980 contained § 107. 33 F.3d at 100. In 1986, CERCLA was amended (the SARA amendments) and § 113 was added. The court in *United Technologies* focused on the different statutes of limitations in the SARA amendments, CERCLA § 113(g)(2) providing a six-year statute of limitations for CERCLA § 107 actions, while CERCLA § 113(g)(3) provides a three-year statute of limitations for contribution actions. That court stated that the kind of action contemplated by CERCLA § 113(g)(2) applied only to what that court characterized as "innocent parties—not parties who were themselves liable", as parties who could recoup the whole of their expenditures. 33 F.3d at 100. The court made clear that by "innocent parties" it meant parties such as "the federal, state or local government." The court then found that the statute of limitations provided at § 113(g)(3) applied to "non-innocent" parties, that is, parties who themselves were liable. The court then, in concluding that the claim of the PRP in that case was a contribution claim, not a § 107 claim, said:

> At face value, this expansive reading of section 9607 [by the claiming PRP] is untenable; carried to its logical extreme, such a reading would completely swallow section 9613(g)(3)'s three-year statute of limitations associated with actions for contribution. Since courts must strive to give effect to each subsection contained in a statute, indeed, to give effect to each word and phrase, *see United States v. Nordic Village, Inc.,* 503 U.S. 30, 34–36, 112 S.Ct.

1011, 1015, 117 L.Ed.2d 181 (1992); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985), we refuse to follow a course that ineluctably produces judicial nullification of an entire SARA subsection.

33 F.3d at 101.

The court in *United States v. Colorado and Eastern R.R.,* 50 F.3d 1530 (10th Cir.1995), reached a like conclusion, saying:

> In our case, Farmland's claim against the CERC parties must be classified as one for contribution. There is no disagreement that both parties are PRPs by virtue of their past or present ownership of the site; therefore, any claim that would reapportion costs between these parties is the quintessential claim for contribution. *See* Restatement (Second) of Torts § 886A (1979); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989) ("[w]hen one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA" § 9613(f)). Furthermore, were PRPs such as Farmland allowed to recover expenditures incurred in cleanup and remediation from other PRPs under § 107's strict liability scheme, § 113(f) would be rendered meaningless.

> Whatever label Farmland may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Accordingly, we hold, as a matter of law, that Farmland's claim is controlled by § 113(f) and that the district court erred in proceeding under § 107.

*Id.* at 1536.

The Objecting PRPs next focus on the limitation that only claims for contribution "regarding matters addressed in the settlement" may not be the subject of a § 107 claim, and costs already incurred by the Objecting PRPs cannot be said to be "matters addressed" in the Settlement Agreement. As we understand this argument of the Objecting PRPs, they are saying that costs already incurred cannot be said to be "matters addressed" because there is no express allocation in the Settlement Agreement to such costs. To dispose of this contention by the Objecting PRPs, we need look no further

than the express language of the Settlement Agreement, that the bar against third-party claims against debtors extends to "all existing or future" claims. The position of the Objecting PRPs on this score is without merit. Debtors' motion that the claims of the Objecting PRPs be disallowed pursuant to CERCLA § 113(f)(2) will be granted.

Debtors move alternatively that the contingent component of any claim asserted by the Objecting PRPs is barred by § 502(e)(1)(B) of the Bankruptcy Code. The Objecting PRPs assert that debtors are not entitled to relief on this basis because they cannot establish that the claims are for contribution, filed by a party "co-liable with the debtor" to a third party, and contingent at the time of disallowance, conditions required in *In re Eagle Picher Industries, Inc.*, 164 B.R. 265 (S.D.Ohio 1994). Having concluded above that the claims by the Objecting PRPs are for contribution, and because at this moment the Objecting PRPs and debtors are co-liable to the U.S., and finally because it is undisputed that we are talking about contingent claims, the bases for the relief here sought by debtors are present. Accordingly, the motion of debtors to disallow the claims of the Objecting PRPs on the basis of § 502(e)(1)(B) will be granted.